UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | CRIMINAL No. 1:19-mj-02417-MBB |
| v. | ) | |
| | ) | |
| Julio Ortiz Chaparro, | ) | |
| Defendant. | ) | |
| | ) | |

## JULIO ORTIZ-CHAPARRO'S MOTION TO RE-OPEN DETENTION HEARING AND FOR RELEASE ON CONDITIONS

Mr. Julio Ortiz Chaparro, the defendant in the above-captioned matter, respectfully moves this Court for a detention hearing. Previously, Mr. Chaparro voluntarily consented to detention on August 29, 2020. However, given the recent outbreak of the global pandemic of COVID-19 and the risks it presents to incarcerated individuals, coupled with the release plan Mr. Chaparro now has in place, he respectfully requests a hearing on the matter of detention and requests that he be released on conditions sufficient to assure his appearance in Court and ensure the safety of the community.  See 18 U.S.C. § 3142(f).  The conditions proposed are restrictive, in many ways demanding more of Mr. Chaparro than any custodial pre-trial detention, and are adequate to overcome the presumption of detention applicable in this type of case.  See 18 U.S.C. § 3142(e).  Although the charge triggers a rebuttable presumption of detention, a fair consideration of the factors set forth in 18 U.S.C. § 3142(g) overcomes that presumption and warrants his release. Further, given the current COVID-19 Pandemic and Public Health emergency, Mr. Chaparro's release on conditions is necessary to ensure compliance with public health mandates and 'social distancing', protect the safety of the community within the jails, and reduce the risk of an outbreak of community transmission of the virus.

## FACTS

The current charges stem from an alleged multi-defendant drug conspiracy in August 2019 in Lawrence, Massachusetts. Mr. Chaparro is charged with conspiracy to distribute and possession with intent to distribute five kilograms or more of Cocaine, in violation of 21 USC § 846. The Government moved to detain Mr. Chaparro and on August 29, 2019 a probable cause and detention hearing was held before Magistrate Judge Kelley (Docket No. 6). The Court found probable cause and Mr. Chaparro consented to voluntary detention. (Docket No. 6). For the reasons discussed below, careful consideration of the 18 U.S.C. §3142(g) factors suggests that release for Mr. Chaparro is now warranted.

## I.    NATURE OF ALLEGED OFFENSE

The discovery provided by the Government to Mr. Chaparro indicates that in August 2019, federal agents were alerted to the scheduled shipment of a suspicious package (shipped from Puerto Rico to Universal Automotive in Lawrence, Massachusetts). The package was addressed to "Universal Automotive, 576 Haverhill Street, Lawrence, MA" with the cosignee listed as "Frank Torres", identified as co-defendant Edgar Castro.[1] The package, intercepted by U.S. Customs and Border Protection ("CBP), contained black plastic bins filled with paper, transistors, and approximately twenty-nine brick shaped packages, five of which tested positive for the properties of cocaine.

Agents arranged a controlled delivery of the package to the intended address on August 26, 2019, during which an undercover agent (posing as a delivery driver) called Mr. Castro's phone (the target telephone), asked to speak to the recipient of the package "Mr. Torres", and then spoke with Mr. Castro, advising him of the package's delivery. A second phone call was

---

[1] A telephone number (the target telephone), listed by the package's sender as the contact telephone number, was the subject of a search warrant for cell site location data. The telephone's location data revealed a target premises determined by the government to be the primary residence for Mr. Castro.

then made from the target telephone to the undercover agent, and the caller, a different unidentified male individual,[2] asked for the name of the driver and advised that "Frank" would sign for the package.

Upon delivery of the package, Mr. Chaparro, along with other individuals present at the garage, was observed assisting in unloading the package and moving its contents (the black plastic bins) into Mr. Castro's vehicle.  However, Mr. Chaparro was neither the individual who met the delivery driver (undercover agent) on arrival, nor did he sign for the package. Agents arrested Mr. Chaparro, his co-defendant, and two others on scene, and subsequently charged Mr. Castro and Mr. Chaparro with conspiracy to distribute and possession with intent to distribute five kilograms or more of Cocaine, in violation of 21 USC § 846.

## II.    MR.  CHAPARRO'S BACKGROUND

Mr. Chaparro is a forty-nine year old man and a citizen of the United States. Born in New York, Mr. Chaparro has been a long-term resident of Massachusetts for over two decades, having lived in Lawrence Massachusetts for over twenty years. His current partner of almost two years, Nancy Dejesus, was born and raised in Lawrence, Massachusetts and should he be released, he plans on living with her at her home in Lawrence, MA. (*See attached*, Exhibit A, Ms. Nancy Dejesus Support Letter). Mr. Chaparro is trained as an auto-mechanic and hopes to continue his work in his trained field once the COVID-19 public health pandemic subsides and the current "stay at home" order is lifted.

Despite his previous criminal record, Mr. Chaparro has only one previous conviction from 2009, he has never been charged or convicted of a crime of violence, and he is not alleged to have engaged in any type of violence in the instant case. Moreover, despite his record, he has

---

[2] The government alleges that the individual on this second call was Mr. Chaparro.

previously voluntarily come to court when required in the past.[3] Although he does have one open

case from June 2018, it is for a misdemeanor driving violation and civil infractions, and does not

involve illegal substances or violence of any kind.

III.    **DISCUSSION**

    a.   <u>**Mr. Chaparro is Not a Flight Risk and Does Not Pose a Danger to his**</u>
<u>**Community.**</u>

This case is charged as a multi-defendant conspiracy, involving, among other things,

audio and video recordings, cellular location data, and may take significant time to go trial.

During that time, Mr. Chapparo could be released on conditions that mandate he live with his

partner Ms. Dejesus in her home in Lawrence and that he be subjected to electronic monitoring

and home confinement. Enabling him to live with his partner at her home, where he would have

a stable, safe, and supportive living environment that would allow him to engage with his family,

his community, and protect his health pending the outcome of this case. With the supervision of

the Pre-Trial and Probation Office, he will be closely monitored, and if he is not able to meet the

conditions of release required of him, he will find himself quickly before this court.  However,

given his decades long ties to Massachusetts, the social and financial support available to him

here, and his willingness and desire to engage with Probation, detention is not appropriate.

As a long-term resident of Massachusetts with strong ties here and no other means of

financial or community support outside his partner, he poses no risk of flight. Nor can the

Government meet its burden of showing, with clear and convincing evidence, that Mr. Chaparro

---

[3] Of the few defaults that Mr. Chaparro has on his record, all are at least sixteen years old.
Further, the majority of the defaults are for fees or were removed the same day. See defaults,
below:
    1) 1/23/2004 - Docket No.  0362CR7291 & Docket 0362CR6207 – **default for fees**
**after a CWOF** (in relation to operating after a suspended license);
    2) 1/13/2004 – Docket No. 0362CR10422;
    3) 2/21/2007-Docket No. 0618CR007321- **default removed same day**.

is currently a danger to his community. Moreover, the serious risks posed by the current COVID-19 public health pandemic require that individuals protect themselves (and their loved ones) by remaining at home, "social distancing", and constructively "sheltering in place". To engage in any other type of behavior outside the home would place Mr. Chaparro's health (and his family's health) in serious jeopardy. Thus, any hypothetical risk of flight or danger to the community is further negated by the very dangerous health risks of COVID-19 and the reality that Mr. Chaparro would be confined to his home for the sake of his own safety (and that of his family).

> **b. Failure to Release Mr. Chaparro will Result in Significant Adverse Consequences, Including a Serious Risk to His Safety and Health as well as the Health and Safety of the Public Given the COVID-19 Pandemic.**

*The COVID-19 Outbreak in Massachusetts*

Currently, Massachusetts is experiencing a COVID-19 outbreak via community transmission. Governor Charlie Baker declared a State of Emergency on March 10, 2020. Massachusetts Executive Order No. 591.[4] The governor has ordered all schools to close until May 4, 2020,[5] has banned public gatherings.[6] As of March 31st, Massachusetts had 6620 confirmed Covid-19 cases.[7] It is now estimated that the rate of new infections in Massachusetts is growing exponentially each day.[8] In response to the rapid growth rate of new infections, a 'Stay-at-home' order was issued for all of Massachusetts,[9] in order to try to "flatten the curve" of the exponential spread of the virus.

---

[4] Available at https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19.

[5] Available at https://boston.cbslocal.com/2020/03/25/coronavirus-massachusetts-schools-closed/

[6] *Baker closes schools, restricts restaurants, bans gatherings over 25 as community spread of coronavirus seen in 7 Mass. counties,* The Boston Globe (March 15, 2020).

[7] Available at https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring

[8] Available at https://en.wikipedia.org/wiki/2020_coronavirus_pandemic_in_Massachusetts

[9] Available at https://www.mass.gov/news/governor-charlie-baker-orders-all-non-essential-businesses-to-cease-in-person-operation

*Confinement and the Spread of COVID-19*

These measures have been taken because "social distancing" is critical to slowing the spread of COVID-19.[10] "But behind bars, some of the most basic disease prevention measures are against the rules or simply impossible. Separating sick people from well people to prevent the disease from spreading can be nearly impossible in prison . . . People in prisons and jails live every minute of the day in close proximity to each other."[11]

In addition, "[t]he incarcerated and justice-involved populations contain a number of groups that may be particularly vulnerable to COVID-19."[12] COVID-19 is particularly dangerous to older people, pregnant women, and people with pre-existing medical conditions including, but not limited to, high blood pressure, heart disease, lung disease, cancer, diabetes, HIV and/or other autoimmune diseases.[13]

A significant percentage of our correctional population in Massachusetts is aged 60 and

---

[10] The Justice Collaborative, *Explainer: Prisons and Jails are Particularly Vulnerable to COVID-19 Outbreaks*, available at: https://thejusticecollaborative.com/wp-content/uploads/2020/03/
TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

[11] *Id*.

[12] Prison Policy Initiative, *No need to wait for pandemics: The public health case for criminal justice reform* (March 6, 2020), available at: https://www.prisonpolicy.org/blog/2020/
03/06/pandemic/.

[13] Both the World Health Organization and the Centers for Disease Control report that older people and those with underlying medical conditions like cardiovascular disease, diabetes, chronic respiratory disease, and cancer are at greater risk. See World Health Organization Coronavirus Disease 2019 (COVID-19) Situation Report – 51, available at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf, and Centers for Disease Control and Prevention, People at Risk for Serious Illness from COVID-19, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.
While the evidence is not yet clear regarding the risks posed by COVID-19 to pregnant women, the CDC has recognized that the flu is particularly dangerous for pregnant women, in part because fever—also a common symptom of COVID-19—is especially unsafe during pregnancy. See Centers for Disease Control and Prevention, Pregnant Women & Influenza, available at https://www.cdc.gov/flu/highrisk/ pregnant.html.

over and/ or is burdened with chronic medical conditions like those described above. "There is a risk that a significant proportion of people who are incarcerated will experience severe COVID-19 disease requiring hospitalization" if infected. (*See Attached*, Exhibit B, Affidavit of Dr. Danielle Ompad, Ph.D., Associate Professor of Epidemiology at New York University School of Global Public Health, pp. 5-6 (hereinafter "Ompad Affidavit")).

"The introduction of COVID-19 to a correctional setting could be from visitors, correctional staff, attorneys and/or a newly incarcerated person. The person will likely be asymptomatic. As a result the first facility acquired COVID-19 case will not be detected until that person shows symptoms. This means that the person could be transmitting the infection from 2-14 days without knowing it. . . .  These infections could spread rapidly by the time the first case is identified. . . ." (Opmad Affidavit, p. 6).

With community spread of the virus in Massachusetts, we must take every necessary action to protect vulnerable populations and the community at large. Reducing the number of people in detention facilities is an urgent matter in this time of national emergency. People residing in close living quarters, including prisons, are at particular risk of contracting COVID-19. [14] Releasing people who are held unnecessarily is critical both to minimize the number of people who face that risk and to reduce the density of detention facility populations. Moreover, people who contract the virus will need urgent medical care and the jails, houses of corrections, and prisons do not have adequate medical care capacity to deal with a spread of the virus within the

---

[14] *See* Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State and Local Leaders from Public Health and Legal Experts in the United States, March 2, 2020, available at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf

institution.  Everyone, including correctional employees, will be in extreme danger when the

virus spreads within a detention facility.[15]

*Specific Conditions for Mr. Chaparro at Plymouth County House of Correction*

Mr. Chaparro is currently detained at Plymouth County House of Correction ("PCHC"). As

of March 24, a staff member at this facility has tested positive for COVID-19, and the Sheriff of

the facility has stated that, "it [is] only a matter of time – not if, but when - the jail will see its

first case of the virus."[16]

Detainees at PCHC live together in cells with multiple bunks, on units of up to sixty two

men, and share communal meals, communal recreation, communal bathroom and shower use,

and are not provided with alcohol-based sanitizers or anti-bacterial soap. This environment of

---

[15] People regularly cycle in and out of jails and prisons and people who work in them leave and return daily. See Pandemic Influenza and Jail Facilities and Populations, Am. J. Public Health, 2009 October 99 for a discussion of how the cyclical nature of incarceration increases the risk of exposure during pandemics, available at https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC4504367/.
Viruses of all kinds have multiple entry points, and those that enter tend to spread fast. Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with a high number of cases.
When Coronavirus suddenly exploded in China's prisons, there were reports of more than 500 cases spreading across four facilities; those affected included both correctional officers and incarcerated people. See https://www.cnbc.com/2020/02/21/coronavirus-china-says-two-prisons-reported-nearly-250-cases.html
Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency." Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
In response to this risk of transmission of COVID-19 within incarcerated populations, states and cities have begun releasing inmates to decrease their prison populations. See https://www.cnn.com/2020/03/16/us/inmates-released-jail-coronavirus-trnd/index.html

[16] Available at https://plymouth.wickedlocal.com/news/20200324/plymouth-county-sheriffs-department-employee-contracts-covid-19.

incarceration prohibits physical social distancing (at least six feet from others) or hand sanitizing with alcohol-based sanitizers, the behaviours crucial to prevention of COVID-19 transmission. (Ompad Affidavit, p. 2). Given both the pandemic and the positive test results of a PCHC staff member, detention of Mr. Chaparro places his health at significant increased risk.  This risk to Mr. Chaparro's health is further exacerbated by the fact that, at age forty-nine, he is on the cusp of an age cohort that is at an increased risk of severe COVID-19 health complications and death, and suffers from high blood pressure, a condition that further increases his risk. (Opmad Affidavit, pp. 1, 5).

Further, Mr. Chaparro's continued detention increases the "danger to the community"—the staff and the inmates inside the jail—by potentially bringing the virus into the facility, and by contributing to the density of inmates and increasing the risk of community transmission when an outbreak occurs. Epidemiologists who have studied and understand the spread of respiratory diseases like COVID-19 in correctional settings urge that decreasing the prison population *now* can prevent outbreaks which will ultimately protect those in the facilities, including employees and their families.

Decreasing the prison population will reduce the impact an outbreak will have on our hospitals and those in the community at large. The rate of transmission between a population of densely packed incarcerated individuals will result in large rates of new infections, many of which will require critical medical attention. This will contribute to the "spike" in the curve of infections, further taxing our healthcare system, burdening resources, and resulting in less healthcare resources for others in need. "By acting now and releasing a significant number of people who are currently detained you will save lives. . . .  This would result in the courts contributing to "Flatten the Curve" effort. . . ." (Ompad Affidavit, 7).

In order to mitigate the risk harm to Mr. Chaparro, the community within the jail, and to comply with behaviors mandated by the Governor of Massachusetts and the Center for Disease Control to "flatten the curve", it is critical that those who can be released are released as soon as possible. Mr. Chaparro has the support of family and a safe and sanitary place to live where he will be able to properly social distance and protect his own health (and the public's health). Moreover, once the Massachusetts "stay-at-home" order is lifted, Mr. Chaparro has job skills that will enable him to find a job, work, and support himself and contribute to his family and community pending the outcome of this case.

IV.     **PROPOSAL FOR RELEASE**

As such, Mr. Chaparro proposes that he be released on appropriate conditions, including, but not limited to, the following:

1. Live with his partner Nancy Dejesus, at her home at ████████████ in Lawrence, Massachusetts;

2. Electronic monitoring;

3. Home confinement;

4. Comply with Massachusetts public health mandates, including the current "stay-at-home" order aimed at flattening the curve to stem the increase of COVID-19 infections;

5. Whatever other conditions the Court deems appropriate.

Respectfully Submitted
Defendant, Julio Chaparro
By his attorney,

/s/ Forest O'Neill-Greenberg
Forest O'Neill-Greenberg
BBO No. 674760
HEDGES & TUMPOSKY LLP
50 Congress St., Suite 600
Boston, MA 02109

T) 617/722-8220

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on all counsel of record on April 1, 2020 by complying with this court's directives on electronic filing.

/s/ Forest O'Neill-Greenberg